O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DAVID RIBOT, PERRY  HALL,            )   Case No. CV 11-02404 DDP (FMOx)
JR., DEBORAH MILLS, ANTHONY          )
BUTLER, JENNIFER BUTLER,             )   **ORDER GRANTING IN PART AND**
JONATHAN LUNA and LOIS               )   **DENYING IN PART MOTION FOR CLASS**
BARNES, individually, and on         )   **CERTIFICATION AND MOTION FOR**
behalf of all others                 )   **CONDITIONAL CERTIFICATION**
similarly situated,                  )
                                     )   [Dkt. Nos. 127 & 135]
                Plaintiffs,          )
                                     )
     v.                              )
                                     )
FARMERS INSURANCE GROUP,             )
FARMERS INSURANCE EXCHANGE,          )
21st CENTURY INSURANCE               )
COMPANY and AIG INSURANCE            )
SERVICE, INC.,                       )
                                     )
                Defendants.          )
                                     )
_____        )

     Presently before the court are Plaintiff David Ribot, Perry

Hall, Jr., Deborah Mills, Anthony Butler, Jennifer Butler, Jonathan

Luna, and Lois Barnes (collectively "Plaintiffs")'s Motion for

Class Certification Pursuant to Federal Rule of Civil Procedure 23

("Class Certification Motion") and Motion for Conditional

Certification Under 29 U.S.C. 216(b) ("Conditional Certification

Motion").  Having considered the parties' submissions and

1  supplemental briefing and heard oral argument, the court adopts the

2  following order.

3  **I. BACKGROUND**

4        Plaintiffs are current and former employees of Farmers

5  Insurance and Twenty-First Century Insurance Company[1] who worked as

6  "Customer Service Representatives" ("CSRs") in call centers, called

7  ServicePoints and Help Points, in California, Oregon, Kansas,

8  Texas, and Michigan. (Second Amended Complaint ("SAC") ¶¶ 1.4-1.5.)

9  Plaintiffs' "principal job duty" was "to handle in-bound telephone

10  calls from insurance agents and policyholders, to answer questions

11  concerning home and automobile insurance policies, provide agents

12  with technical support, underwriting advice, and assistance with

13  billing and customer service to policy holders." (Id. ¶ 6.3.)

14  Plaintiffs allege that they were "required to arrive approximately

15  15 minutes before their scheduled shift in order to boot up their

16  computers, load programs, log on to the telephone system, review

17  emails and other essential work activities." (Id. ¶ 1.7.)  They

18  also allege that they performed post-shift duties, "including

19  customer service calls that extend beyond the end of their shift

20  and the tasks associated with shutting down their computer

21  systems," for which they were not compensated.  (Id.)

22        Plaintiffs filed their original Complaint on March 22, 2011.

23  In July 2011, Plaintiffs learned of an investigation by the

24  Department of Labor Wage and Hour Division ("DOL") into similar

25  allegations at facilities in Oklahoma, Kansas, Oregon, Michigan,

26  and Texas. Farmers and the DOL settled those claims on June 15,

27

28        [1]Acquired by Farmers in 2009.

2011.  (Mot., Exhs. 1-3, FLSA Narratives.)  The DOL reports indicate that Farmers changed its policy, requiring employees to log into the phone prior to booting up the computer and other activities.  (See, e.g., Exh. 3 at 5.)  The DOL found that Farmers was in compliance at ServicePoint locations by February 1, 2010, and at HelpPoint locations by May 10, 2010.

## II. CLASS CERTIFICATION

Plaintiffs seek certification of five state law class actions to recover unpaid wages, overtime compensation, liquidated damages, attorneys' fees, and costs on behalf of current and former Customer Service Representatives ("CSRs") who are alleged to have been required to perform off-the-clock work.  Each class comprises Farmers or 21st Century Insurance facilities in one of five states (California, Kansas, Texas, Michigan, Oregon).

### A. Legal Standard

The party seeking class certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are met.  See Hanon v. Dataprods. Corp., 976 F.2d 497, 508-09 (9th Cir. 1992).  Rule 23(a) sets forth four prerequisites for class certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

1  Fed. R. Civ. P. 23(a); Hanon, 976 F.2d at 508.  These four

2  requirements are often referred to as numerosity, commonality,

3  typicality, and adequacy.  See Gen. Tel. Co. of Southwest v.

4  Falcon, 457 U.S. 147, 156 (1982).  "In determining the propriety of

5  a class action, the question is not whether the plaintiff or

6  plaintiffs have stated a cause of action or will prevail on the

7  merits, but rather whether the requirements of Rule 23 are met."

8  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974) (internal

9  quotation marks and citation omitted).  This court, therefore,

10 considers the merits of the underlying claim to the extent that the

11 merits overlap with the Rule 23(a) requirements, but will not

12 conduct a "mini-trial" or determine at this stage whether

13 Plaintiffs could actually prevail.  Ellis v. Costco Wholesale

14 Corp., 657 F.3d 970, 981, 983 n.8 (9th Cir. 2011).

15     **B. Discussion**

16         **1. Ascertainability**

17     "Although there is no explicit requirement concerning the

18 class definition in FRCP 23, courts have held that the class must

19 be adequately defined and clearly ascertainable before a class

20 action may proceed."  Pryor v. Aerotek Scientific, LLC, 278 F.R.D.

21 516, 523 (C.D. Cal. 2011)(internal citations and quotation marks

22 omitted).  "[A] class will be found to exist if the description of

23 the class is definite enough so that it is administratively

24 feasible for the court to ascertain whether an individual is a

25 member."  O'Connor v. Boeing North American, Inc., 184 F.R.D. 311,

26 319 (C.D.Cal. 1998).

27     Defendants assert that the class is not ascertainable because

28 the class definitions contain "representative job titles" rather

4

than a fixed set of positions or job descriptions.  (Opp. to Class Cert. at 28; for class definitions, see Class Cert. Motion, Exh. 44.)  They also assert that these "representative job titles" contradict Plaintiffs' papers where the putative class is defined as including employees with "customer facing job positions" whose "central job duty was to take inbound telephone calls from Defendants' policyholders and agents."  (Class Cert. Motion at 13.)

The court finds that identifying the class members by their function rather than their position or title does not make it infeasible to determine which employees are class members. For purposes of clarity, the court modifies each class definition to include the more specific description of the job function, as follows:

> All persons who are, or have been, employed by Farmers
> Services, LLC., and/or Farmers Insurance Exchange in the
> State of [state name] as call center employees who
> performed the job duties of a "Customer Service
> Representative" or a similar <u>customer-facing</u> job position
> <u>with the central duty of taking inbound telephone calls</u>
> <u>from policyholders and agents</u>, during the time period
> between [date] and [date].

(Emphasis indicates the court's modifications.)

### 2. Overbreadth

#### a. Start date of class period

Defendants also assert that the class is overbroad because it includes members whose claims are barred by state statutes of limitations.  For instance, the claims under California law have a four year statute of limitations.  Cal. Bus. & Prof. Code § 17208.

The action was filed on March 22, 2011, so the class period would ordinarily begin no earlier than March 22, 2007.  However, the California class period is defined as beginning on July 22, 2005. (Class Cert. Mot., Exh. 44.)  Defendants speculate that Plaintiffs arrived at this class period by adding on a 19-month tolling period based on the DOL-Farmers Tolling Agreement.  (Martoccia Decl., Exh. 32.)

### i. DOL-Farmers Tolling Agreement

The Tolling Agreement states that the "Secretary or affected employees may ultimately bring legal proceedings under the Act," but that in order to allow time for settlement discussions, "the Firm agrees not to raise this tolling period in any other defense raised by the Firm (including laches) that otherwise would be available to the Firm concerning the timeliness of any legal proceedings that may be brought against the Firm."  (Martoccia Decl. Exh. 32.)

Defendants argue that the Tolling Agreement "tolls only the DOL's ability to commence an action pending the resolution of the DOL investigation" and that because putative class members are "not parties to the agreement," it does not apply to suits initiated by them.  (Opp. at 29 n. 108.)  They also argue that the tolling agreement does not apply to state law claims because it does not mention such claims. (Id.)

Plaintiffs assert that according to its plain language, the Tolling Agreement bars Farmers from asserting any statute of limitations argument, no matter the cause of action or the party asserting that cause of action.

1    The court finds that the Tolling Agreement is reasonably
2    interpreted as applying only to claims under the FLSA, not to state
3    law claims.  The Tolling Agreement mentions only FLSA claims.  It
4    frames the purpose of the Agreement by stating that "[t]he
5    Secretary or affected employees may ultimately bring legal
6    proceedings under the Act.  However, the running of the statute of
7    limitations . . . may bar the assertion of certain rights under the
8    Act . . ." (Martoccia Decl., Exh. 32 at FIE001163 (emphasis
9    added).)  Additionally, paragraph 5 states that "The Firm agrees
10   that this Agreement . . . may be introduced into evidence as proof
11   of the tolling agreed to herein, in all legal proceedings that may
12   be brought pursuant to Sections 16(b), 16(c), and/or 17 of the
13   Act."  (Id. at FIE001164.)

14                    **ii. Conclusion on class period start date**

15        Because the statute of limitations is tolled only for claims
16   under the FLSA, the putative class, which is asserting only state
17   law claims, cannot benefit from it.  For this reason, the start
18   date of all classes should reflect the relevant state law statute
19   of limitations without including any tolling on the basis of the
20   DOL-Farmers Tolling Agreement.[2]

21                    **b. End date of class period**

22        Defendants also assert that the class period is overbroad
23   because of the modification of phone login procedures at
24   ServicePoint contact centers after February 1, 2010, and at
25   HelpPoint contact centers after May 10, 2010.  According to the

26

27        [2] This modification of class start dates does not affect any
28   other potential claims to tolling that class members might
     ultimately assert, apart from the DOL-Farmers Tolling Agreement.

7

DOL, these changes brought Farmers into compliance; Plaintiffs do
not contest that the violations related to pre-shift work ceased
with the modification of the log-in procedures.  (Opp. to Class
Cert at 29.)  As discussed in sections II.B.4.b.iii-iv below, the
court finds that Plaintiffs have presented a common question of law
and fact only as to their claims regarding pre-shift work.  The
class is accordingly limited to the period prior to the change in
policy regarding log-on procedures, namely February 1, 2010, at
ServicePoint contact centers and May 10, 2010, at HelpPoint contact
centers.

### 3. Numerosity

To meet the requirements of Rule 23(a), Plaintiffs must first
demonstrate that "the class is so numerous that joinder of all
members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Courts will
typically find the numerosity requirement satisfied when a class
includes 40 or more members.  See Rannis v. Recchia, 380 Fed. Appx.
646, 651 (9th Cir. 2010).

Plaintiffs' evidence of numerosity is the FLSA Narrative
Report, which identified 1,288 affected employees in Kansas, 446 in
Oregon, 650 in Michigan, and 557 in Texas.  (Exh. 3, 5-6.)  They
also provide deposition testimony on the number of customer service
representatives at various facilities.  (See Thomas Dep. 25:4-8,
36:2-36:17; A. Butler Depo 43:10-17; J. Butler Depo 33:8-11;
Salgado Depo. 25:12-15; Peters Depo. 37:23-38:10; Ribot Depo. 39:1-
5.)  Defendants argue that Plaintiff have not presented any
evidence that each state class meets the numerosity requirement.
The court disagrees.  Plaintiffs have presented evidence that does
not establish the exact size of the class but does establish that

8

each subclass contains a large number of members, and Defendants have presented no evidence suggesting otherwise.  "Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied."  Orantes-Hernandez v. Smith, 541 F. Supp. 351, 370 (C.D. Cal. 1982).

The court finds that the numerosity requirement is satisfied.

### 4. Commonality

Second, Plaintiff must demonstrate that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Rule 23(a)(2) has been construed permissively.  All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient . . . ."  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  Indeed, "[e]ven a single [common] question will do," so long as that question has the capacity to generate a common answer "apt to drive the resolution of the litigation."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551, 2556 (2011) (internal quotation marks omitted).

Defendants challenge Plaintiffs' showing of commonality on the grounds that they have not offered any evidence to support their specific state law causes of action; they have not shown a common policy to require off-the-clock work; and they have not offered a viable method of demonstrating class-wide injury based on common proof.

### a. State Law Causes of Action

Defendants argue that Plaintiffs have not offered any evidence to support their causes of action under state law, which include

1  failure to pay minimum wage, failure to compensate for overtime,

2  breach of contract, quantum meruit, failure to provide adequate

3  wage statements, and failure to pay all wages owed upon

4  termination.  (Opp. to Class Cert. at 13-18.)  Defendants assert

5  that Plaintiffs have failed to show how they can establish the

6  elements of each state law claim on a classwide basis.  With

7  respect to breach of contact, for instance, Defendants assert that

8  Plaintiffs do not set forth the terms of any contracts, explain how

9  they were breached, or explain how to adjudicate such a cause of

10  action on a classwide basis.  (Id. at 15.)

11      Plaintiffs contend that they do not need to present such

12  evidence at this time.  (Reply to Class Cert. at 6.)  They claim to

13  have presented evidence of common questions of law and fact

14  centering on the issue of why customer service representatives were

15  not paid for work they did before and after their shifts.

16  Resolving these common questions will be the basis for determining

17  whether there were violations of state laws during the merits

18  phase.  They compare the determination on state law claims to

19  determination of damages, which does not in itself defeat class

20  certification even if it is not susceptible to class treatment.

21  See Yokoyama v. Midland Nat. Life Ins. Co., 594 F.3d 1087, 1089

22  (9th Cir. 2010)(internal quotation marks and citation omitted)("The

23  potential existence of individualized damage assessments . . . does

24  not detract from the action's suitability for class certification.

25  Our court long ago observed that the amount of damages is

26  invariably an individual question and does not defeat class action

27  treatment.").

28

1   The court agrees with Plaintiffs that if they establish a

2   common question of fact as to pre-shift and/or other off-the-clock

3   work, the issue of whether those facts ultimately violate state

4   laws can be determined at a later phase and is comparable to a

5   damages calculation, which does not defeat class treatment even if

6   it involves individual calculations.

7                    **b. Common Policy**

8   Defendants assert that Plaintiffs have not provided proof of a

9   common policy of requiring off-the-clock work, and that they cannot

10  make such a showing because Defendants have always prohibited off-

11  the-clock work.[3]  Plaintiffs respond that, to the contrary, they

12  have provided proof of a number of common policies relevant to the

13  alleged off-the-clock work requirement.  The court shall address

14  each purported policy separately.

15                **i. Instructions from supervisors**

16  Plaintiffs have presented substantial deposition testimony to

17  the effect that supervisors instructed customer service

18  representatives that they needed to be ready to work by the time

19  their shift started, implying or explicitly stating that employees

20  needed to arrive early to perform preliminary tasks.  See, e.g.,

21  Exh. 28, Lampton Depo., 47:18-20 ("You were just told if – if you

22  were not ready and working by 8:00, that there was a possibility

23  that you could be written up, counseled."); id. 83:10-11 (a manager

24  repeatedly "said that policy was everybody was to be at their desk

25

26      [3] Defendants refer generally to employee handbooks without

27  point to specific sections, citing Andernacht Decl., Exh. A; Booth
    Decl., Exh. C; and Lingo Decl., Exh. D.  The court declines to

28  scour the 50-70 page handbooks for passages where off-the-clock
    work is prohibited.

ready to work at their scheduled time."); Exh. 38, Ernst Depo., 123:25-124:7 (it was verbally communicated that employees needed to be ready to answer calls at the beginning of their shift); Exh. 29, A. Butler Depo., 92:9-92:21; 146:20-24 ("So if a customer service representative did not arrive early enough to perform the pre-shift tasks before their scheduled shift they were 'talked to' by management instead of 'admonished'"); Exh. 36, Mills Depo., 89:24-90:17 ("So when the 8:00 o'clock time came, or whatever time you're supposed to time in, you can get into the computer – not get into it, but be able to navigate it to get all ready to go . . ."); Exh. 32, Thomas Depo., 34:3-11 ("We were told that we need to be ready for work at our scheduled time, we need to be on the phone at that time . . . . At one point we were told that we needed to come in earlier so that we could log on and be on our phone at our scheduled time."); Exh. 37, Peters Depo., 33:24-34:1 ("[T]hey advised us that we need to be up and going by our time – when our time starts.  Be willing – able to take a call."); and Exh. 35, Luna Depo., 60:7-8 ("[W]e were told to show up 10 to 15 minutes prior to our shift starting.").  (See also Reply to Class Cert. at 2-3 nn. 3-6.)

This testimony from multiple facilities is sufficient evidence that supervisors instructed employees to arrive early to perform functions necessary to being ready to work at their designated shift time.

### ii. Schedule adherence

Plaintiffs argue that "CSRs were presented with a no-win situation: comply with Defendants' policy to perform pre-shift work every day while off-the-clock, or start working at their scheduled

1   time, but be considered out-of-adherence, tardy, and be unable to

2   effectively perform their duties." (Class Cert. Mot. at 9.)

3   Plaintiffs point to the "schedule adherence" metric used in

4   employee performance evaluations. Adherence measures a CSR's

5   availability to take calls while logged into the system. A CSR is

6   out of adherence if she is logged in but unavailable to take calls,

7   as indicated by a code she enters into the phone. One employee

8   explained schedule adherence as follows:

9       Farmers scheduled you to be in different work modes

10      throughout the workday such as "available," "lunch," or

11      "meeting." If you were in a work mode that did not match

12      up with the work mode that was scheduled for you, you'd

13      be considered "out of adherence," which would negatively

14      impact your performance scores.

15      Farmers scheduled you to be in "available" mode at

16      the start of your shift or very soon thereafter.

17      However, once you clicked "available," you would almost

18      immediately start receiving calls from customers. So, if

19      you started receiving calls without first having all of

20      your programs up and running, you wouldn't be prepared

21      with the tools needed to effectively help the customer in

22      a timely manner. . . .

23      The only other option you had at the start of your

24      shift was to use "aux" mode while you waited for your

25      programs to finish loading. However, you couldn't take

26      calls while being in "aux," so it hurt your adherence

27      score throughout the day like "after call work," you

28

1  didn't want to use "aux" mode each and every morning that

2  you reported to work.

3 Gordon Decl. ¶¶ 8-10.

4  Schedule adherence appears as a metric in performance

5 evaluations.  See, e.g., Exh. 4 (Perry Hall's year end assessment

6 from 2007) at FAR000019 ("Adherence is an area in which you need to

7 address and make significant improvements, as you are currently at

8 74.93%.  Our goal, as you know, is 85%.  Please focus on improving

9 this metric.")  Performance reports indicate the importance of

10 adherence in personnel evaluations.  See, e.g., Exh. 5, Year End

11 Assessment of Jonathan Luna, FAR 000053 ("[Y]our schedule adherence

12 July - Oct. is 82.36%.  You are not meeting the adherence to

13 schedule goal.  Our ability to handle calls and meet our service

14 levels is contingent on the appropriate forecasting of staffing.

15 Adherence to schedule means you are available to handle our

16 customers calls which contributes to our ability to forecast

17 accurately to meet our service level goals and limit abandoned

18 calls.")

19  Plaintiffs argue that the adherence to schedule metric was

20 part of the policy to require pre- and post-shift work.  If a CSR

21 arrived at 8:00 a.m. for an 8:00 a.m. shift and immediately logged

22 into the phone prior to booting up the computer, she would also

23 have to indicate that she was not able to accept incoming calls by

24 entering a code.  This time would count toward her schedule

25 adherence; she would be considered to be out of adherence for the

26 10 to 15 minutes during which she was preparing her computer to

27 handle calls.  "CSRs were presented with a no-win situation: comply

28 with Defendants' policy to perform pre-shift work every day while

14

off-the-clock, or start working at their scheduled time, but be considered out-of-adherence, tardy, and be unable to effectively perform their duties."  (Class Cert. Mot. at 9.)

Defendants respond that schedule adherence could not have been a pressure on employees to work off the clock because the target adherence rate was only 85%, giving full-time employees approximately 75 minutes per day of time during which they could be out of adherence.  Plaintiffs assert that the target adherence rate was not 85% but 90%, citing Jennifer Butler's performance report (Reply re Cond'l Cert at 9; Exh. 11 at TWE000041)("Jennifer, your adherence stands at 91.48% and you are exceeding your expectations in this area.  We discussed the importance of adherence when you first entered the unit.  I noticed that you were not ready excessively.  We discussed that your not ready [status] impacts your adherence, and once this was brought to your attention, you worked diligently and decrease[d] your not ready time immediately. Recently, your not ready time has increased.  You have been made aware and said that you would work to decrease your not ready time so that you continue to exceed your expectations in this area.  You understand the importance of adhering to schedule, which positively impacts your adherence.  It's nice to know that you focus and work to meet our unit goal of 90% daily.")

Defendants are correct that being out of adherence for 10 to 15 minutes would not in itself result in an employee being unable to meet the 85-90% adherence target.  However, other activities such as bathroom breaks also entered into the calculation of

1   adherence.[4]   Furthermore, as seen in Jennifer Butler's performance

2   evaluation, employees were praised in their performance evaluations

3   for exceeding adherence goals, and increased adherence rates appear

4   to lead to a more positive performance report.   Pressure to adhere

5   as much as possible is expressed in the performance reports.[5]

6   Particularly when taken in conjunction with instructions from

7   supervisors, the schedule adherence policy thus can be considered

8   to be part of a policy to encourage pre-shift work.

9        Defendants also assert that employees were not deemed out of

10  adherence while loading computer programs after logging into the

11  phones.   They cite the "2011 Guidelines for Schedule Adherence"

12  which states: "At the start of their shift CSA's must hard log into

13  the phone before booting up the PC.   Once the PC is ready the CSA

14  should log out of the phone and log into CTI.   This process records

15  the CSA's arrival time for attendance purposes.   During the start

16  up process the CSA is considered in adherence when logged into the

17  phone and not logged into CTI."   (Andernacht Decl., Exh. B at

18  FIE000480.)   However, this policy addresses the system after

19  changes had been made as a result of the DOL investigation, and

20  there is no indication that it was the previous policy.   To the

21

22        [4] Plaintiffs claim that employees are considered out of
23  adherence if they took phone calls past their shift, when calls
    spilled into their lunch breaks, when they needed to enter notes
24  after a phone call finished, "and so on," but the footnotes
    supporting these claims are empty (Reply to Class Cert. at 12 nn.
25  35-36) or do not support the claim they are making (id. n. 34).

26        [5]Defendants argue that the pressure of performance reports
    raises an individualized question because it is a subjective
27  feeling that an employee may or may not have.   (Opp. at 22.)   The
    performance reports, however, are using "objective" criteria, and
28  feeling pressure to meet criteria in performance evaluations is not
    subjective.

contrary, Defendants indicate that the phone log-in policy was changed in 2010.

### iii. Timekeeping system

### a. Policy

Plaintiffs argue that it was a Farmers' policy to modify timecards to reflect scheduled shifts rather than actual time worked: "Should a discrepancy be found between what the CSR entered as the time that they actually worked and what Defendants told them they worked – as reflected in clock-in times and the hours they were scheduled to work – the gatekeeper [i.e. the supervisor who approved the timecards] was required to reject the timecard and instruct the CSR to make 'corrections,' that is, inaccurately record the time that they actually worked." (Mot. at 7, and n. 22.) They present a complex set of evidence purportedly supporting this assertion.  For instance, they point to Procedural Documentation for Timecard Processing which advises supervisors to compare timecards to the "Supervisor Timecard File" and to the login/logout time in the phone system, Avaya, and to reject incorrect timecards. (Exh. 16 at FAR000144, FAR000148, and FAR000149.)

Plaintiffs read these and other handbooks as requiring supervisors to force employees' timecards into the shifts for which the employees were scheduled, as opposed to the time they actually worked.  It is not clear to the court that these handbooks in fact amount to such a policy.  Neither party has given a clear picture of how timekeeping worked at Farmers such that the court would be in a position to interpret the requirements of the handbook. Defendants did not challenge Plaintiffs' characterization of the timekeeping system except to say Farmers' policy was that "the

1   electronic time card must show the specific time the employee

2   starts work, the lunch period, and the time of leaving."   (Mot.,

3   Exh. 13, Employee Manual at FIE00836.)

4       The court is not convinced that Plaintiffs have presented

5   clear evidence of a policy of changing timecards to reflect the

6   time employees were scheduled to work instead of the time they

7   actually worked.

8       Even assuming that Plaintiffs have established such a policy,

9   the court must consider whether individualized questions

10  predominate over class questions. The court finds that

11  individualized questions predominate and that therefore the

12  question of the timekeeping policy is not suitable for class

13  treatment.

14      As discussed above, Farmers' handbooks and policy documents do

15  not present a clear picture of the timekeeping policy.  In

16  addition, Plaintiffs' deposition testimony on the timekeeping

17  system is ambiguous.  On the one hand, the testimony supports a

18  claim that supervisors required employees to modify their

19  timecards.  (See, e.g., Salgado Depo, 59:3-22 ("Well, I had to

20  clock out at 5:00, but if I was caught into a call that threw me to

21  5:10, then I would, yes.  I would – we would clock out at 5:00, and

22  then we were – I was supposed to send this email to our supervisor

23  to let her know that I – you know, that I was caught into a call

24  and that's the reason why I was – that I stayed until 5:10."); and

25  Exh. 37, Peters Depo., 31:17-32:15 ("If the time that you logged in

26  on the phone did not match the time that was on the green screens

27  or vice-versa, they would reject it and talk to you and see what

28  was going on, why it wasn't matching up.").)  However, it does not

18

1  appear to be the case that employees were never compensated for

2  post-shift work due to the timekeeping policy.  See id. 33:8-19

3  (Peters testified that he revised his timecard to reflect that he

4  had worked an additional 30 minutes after the end of a shift and

5  the change was approved by his supervisor and he was paid).

6      Additionally, the deposition testimony raises the question of

7  whether timecard modification was required only to comply with the

8  rounding policy and was primarily used to correct discrepancies

9  shorter than seven minutes, or whether discrepancies of longer

10  periods were also required to be corrected.

11      Furthermore, Plaintiffs have failed to offer a method of

12  common proof to demonstrate class-wide injury.  In re Graphics

13  Processing Units Antitrust Litigation, 272 F.R.D. 489, 497 (N.D.

14  Cal. 2008)(plaintiffs have the burden under Rule 23 "to provide a

15  viable method of demonstrating class-wide injury based on common

16  proof.").  Plaintiffs propose the following methodology:

17        Following certification of the action, and prior to

18        trial, class counsel will work with appropriate experts

19        in the fields of statistical analysis and economics to

20        determine an appropriate methodology for determining the

21        average number of hours worked by the class members, most

22        probably broken down to a daily average, which would then

23        be utilized by the economist expert to extrapolate total

24        damages for the entire class.  Whether done by sample

25        depositions, surveys, or some other methodology, the goal

26        would be to offer proof on a class wide basis such that

27        the global exposure of the defendant would be fairly

28

1        arrived at, with the issue of distribution left to the

2        class counsel and its experts.

3    Decl. John D. Sloan, Jr., ¶ 2. Given the conflicting testimony on

4    whether Plaintiffs were compensated when they worked beyond their

5    scheduled times, this methodology for obtaining common proof is not

6    sufficiently specific to convince the court that individual issues

7    do not predominate.

8                            **iv. Rounding**

9        Prior to January 1, 2011, Farmers rounded time on timecards to

10   the nearest 15-minute increment: if any employee worked seven

11   minutes past the end of her shift, she would not be paid for that

12   time as it was not a "pay impacting" occurrence.  (Mot. at 10.)

13   Plaintiffs claim that this practice deprived them of their pay

14   because "Defendants never took any steps to determine if the

15   rounding rule fairly compensated employees," despite their own

16   policy requiring quarterly audits to "check for any violations of

17   state or federal regulations including labor law" (Mot. at 10

18   n.36. (citing Exh. 17 FAR001040-001308).)  Plaintiffs do not

19   present evidence of a detrimental effect on employees because

20   "Defendants have not yet produced time keeping records for a

21   representative sample of the CSRs and Plaintiffs are still engaged

22   in discovering the analytical data necessary to determine if this

23   policy resulted in systematic under compensation of CSRs." (Id.)

24       Defendants assert that rounding is lawful and that their

25   practice of rounding was neutral.  They claim that Plaintiffs have

26   not demonstrated that this rounding practice resulted in off-the-

27   clock work.  Plaintiffs respond that whether the system worked to

28   the detriment of employees is a merits question, and that

                                    20

1   Defendants do not dispute that they used a system of rounding, and
2   do not know whether they audited the rounding system.  (Reply at
3   13.)

4        Plaintiffs' only evidence on this point is the lack of audits
5   of the rounding system undertaken by Defendants, despite their own
6   auditing policies.  Since rounding is a lawful practice,
7   Defendants' lack of auditing of the rounding system on its own is
8   not a sufficient factual basis on which to establish a policy of
9   not properly compensating employees.  The court finds that
10  Plaintiffs have not presented sufficient evidence on this issue to
11  establish unlawful rounding as a common issue suitable for class
12  treatment.

13                   **v. Conclusion on Commonality**

14       The court finds that Plaintiffs have established common
15  questions of law and fact with respect to their pre-shift work, but
16  not with respect to other off-the-clock work or to Farmers'
17  rounding policy.

18            **5. Typicality**

19       Rule 23(a) also requires Plaintiffs to demonstrate that "the
20  claims or defenses of the representative parties are typical of the
21  claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).
22  "[R]epresentative claims are 'typical' if they are reasonably
23  co-extensive with those of absent class members; they need not be
24  substantially identical."  <u>Hanlon</u>, 150 F.3d at 1020.

25       Defendants argue that Plaintiffs' claim that they worked off
26  the clock is not typical.  They point to deposition testimony from
27  putative class members stating that they were not required to work
28  off the clock.  The court has already discussed this issue with

1  respect to commonality and found that Plaintiffs have established a
2  common question of fact as to whether there was a policy of off-
3  the-clock work.

4      The typicality inquiry centers on the question of whether the
5  representative parties have typical claims and defenses.  With
6  respect to that question, Defendants' main objections are, first,
7  that the named Plaintiffs did not work at all of the facilities
8  from which the putative classes are drawn and, second, that two of
9  the named Plaintiffs, Deborah Mills and Rita Dunken, are not
10  adequate.  For the reasons explained below, the court finds that
11  Plaintiffs have met the typicality requirements.

12      **i. Facilities**

13      Defendants point out that the named Plaintiffs did not work at
14  all the branch facilities from which the putative class will be
15  drawn, and argue that they are not typical because they do not have
16  knowledge of the policies of the other Farmers branches.  The court
17  finds that Plaintiffs have presented sufficient evidence that the
18  policies at issue were in effect at all Farmers call centers.  The
19  various locations, designated as Help Points or ServicePoints,
20  appear to be governed by Farmers-wide policies and to use the same
21  hardware and software systems regardless of the location.  Branch
22  offices of the same company are likely to have the same policies,
23  and Defendants have presented no indication that they used
24  different software or had different hardware, for instance.  A
25  named Plaintiff can therefore be typical of the class she seeks to
26  represent even if she works at a different branch of the same
27  company.  <u>See, e.g.</u>, <u>In re Wells Fargo Home Mortg. Overtime Pay</u>
28  <u>Litig.</u>, 527 F. Supp. 2d 1053, 1063-64 (N.D. Cal. 2007) (holding

that named plaintiffs were typical of class members working at other locations "to the extent that they are subject to the uniform compensation and employment policies that Wells Fargo applies to all HMCs" and to the extent that "the absent class members shared the same job title and were subject to the same policies at issue.").

### ii.  Typicality of Mills and Dunken

#### a. Deborah Mills

Defendants assert that Mills is not typical of the putative class because she was employed only for four months and only as a trainee.  The court finds that Defendants have not indicated any differences between a trainee position and a regular position that would suggest that her injury is not typical of a class member. Like other class members, she would have been subject to a policy of requiring off-the-clock work and would have suffered the same injury as a result.  Her typicality does not appear to be impaired by her trainee status or her relatively brief period of employment.

#### b. Rita Dunken

Defendants assert that Dunken is not an adequate class representative because she worked as a claims associate, and thus answering calls was not her primary job responsibility.  (Decl. Swopes ¶¶ ("Rita Dunken . . . [was a] claims associate[] who, among other job responsibilities, handled incoming calls to the branch claims office in Tigard.  Most of these calls were from customers who simply wanted to be transferred to the claims representative who was handling their claim.  They would also receive calls from insurance agents with questions about claims made by policyholders that they serviced.  In addition to answering such telephone calls,

1  Ms. Dunken . . . had other tasks, such as handling incoming mail,

2  assisting with mailings, following up on uncashed checks, and

3  assisting with duties at the reception desk.  There were at most

4  ten claims associates reporting to me at any given time, and only

5  some of them would handle incoming calls as part of their main job

6  duties.").)

7      Plaintiffs have presented evidence that Dunken was one of the

8  claims associates whose primary job duty was answering calls.

9  (Exh. 8, Dunken Performance Management Form ("Your main job is to

10 answer the calls for the call center is to provide excellent

11 customer service on each and every call you take.  You continue to

12 make sure you assist with their concerns and treat them as number

13 one. . . . Due to your main responsibility as answering calls daily

14 for Oregon and Washington, you are now limited to new job

15 responsibilities . . . .).)  Defendants have not presented any

16 evidence to suggest, for instance, that Dunken used different

17 computer software or was otherwise subject to procedures different

18 from the employees she is seeking to represent, beyond some

19 variation in her job responsibilities.  However, because the

20 primary component of her job does appear to be the primary

21 component of the job of putative class members - answering phone

22 calls - the court finds that Dunken is typical of the class.

23         **6. Adequacy**

24      Finally, Rule 23(a) requires Plaintiff to demonstrate that

25 "the representative parties will fairly and adequately protect the

26 interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Resolution of

27 two questions determines legal adequacy: (1) do the named

28 plaintiffs and their counsel have any conflicts of interest with

1   other class members and (2) will the named plaintiffs and their

2   counsel prosecute the action vigorously on behalf of the class?"

3   Hanlon, 150 F.3d at 1020.

4       Defendants argue that Plaintiffs are not adequate because they

5   seek to represent class members at facilities where they never

6   worked and they submitted declarations that contradicted their

7   deposition testimony and were subsequently retracted.  Defendants

8   do not explain how either of these points renders the Plaintiffs or

9   their counsel inadequate by creating conflicts of interest with

10  other plaintiffs or by calling into question their commitment to

11  prosecuting the action.  The court finds that Plaintiffs have met

12  the adequacy requirement of Rule 23(a).

13              **7. Predominance**

14      Under Rule 23(b)(3), a plaintiff seeking to certify a class

15  must show that questions of law or fact common to the members of

16  the class "predominate over any questions affecting only individual

17  members, and that a class action is superior to other available

18  methods for fairly and efficiently adjudicating the controversy."

19  Fed. R. Civ. P. 23(b)(3).

20      Defendants emphasize the fact that this action contains claims

21  asserted under the laws of five different states and argue that the

22  application of the laws of multiple states make the class

23  unmanageable.  They cite In re Charles Schwab Corp. Securities

24  Litigation, 264 F.R.D. 531, 537 (N.D. Cal. 2009) for the

25  proposition that "[w]here the laws of various states will govern

26  the class claims, the differing state laws inject significant

27  manageability concerns and can prevent certification of the

28  nationwide class."  The court notes, first, that Plaintiffs here

1  are not seeking to certify a nationwide class, but instead five

2  subclasses, each comprising Plaintiffs of one state.  Additionally,

3  as discussed above, the fundamental question of this case - whether

4  Defendants had a policy of requiring pre-shift work - does not

5  depend on the various state laws that would be used to determine

6  the amount of Defendants' liability if they were found so liable.

7  Those laws will be relevant in the damages stage and do not mean

8  that individualized questions will predominate in the primary

9  litigation stages.

10      The court therefore finds that the requirements of Rule 23(b)

11 have been met.

12 **III. CONDITIONAL CERTIFICATION**

13      **A. Legal Standard**

14      Section 206 of Title 29 of the Unites States Code requires

15 that employers pay minimum wages to non-exempt employees. 29 U.S.C.

16 § 206(a).  Section 207 requires that employers pay non-exempt

17 employees overtime.  29 U.S.C. § 207(a).  Pursuant to § 216(b), an

18 action to recover for failure to make overtime payments or to pay

19 minimum wages "may be maintained against any employer . . . by any

20 one or more employees for and in behalf of himself or themselves

21 and other employees similarly situated."  29 U.S.C. § 216(b).  Only

22 employees who give their consent in writing - or "opt in" – will be

23 represented parties.  Id.  This form of representative action is

24 commonly referred to as a "collective action."  "Because non-

25 parties to a collective action are not subject to claim preclusion,

26 giving notice to potential plaintiffs of a collective action has

27 less to do with the due process rights of the potential plaintiffs

28 and more to do with the named plaintiffs' interest in vigorously

1  pursuing the litigation and the district court's interest in

2  'managing collective actions in an orderly fashion.'" McElmurry v.

3  U.S. Bank Nat'l Ass'n, 495 F.3d 1136, 1139 (9th Cir. 2007).

4  District courts have considerable discretion in managing FLSA

5  collective actions, including in determining how and when notice is

6  provided to potential opt-in class members, see Hoffman-La Roche

7  Inc. v. Sperling, 493 U.S. 165, 171-73 (1989), and whether

8  certification of a § 216(b) collective action is appropriate,

9  Leuthold v. Destination America, Inc., 224 F.R.D. 462, 466 (N.D.

10  Cal. 2004).

11      **B. Discussion**

12      Plaintiffs seek conditional certification of the following

13  class for notice purposes:

14      All current and former customer facing call center

15      employees of Defendants, Farmers Services L.L.C., Farmers

16      Insurance Exchange, and 21st Century Insurance Company,

17      that held or hold the position of "Customer Service

18      Representative," "Customer Service Associate," "Customer

19      Service Advocate," or similar positions between the

20      relevant statutory period, three years preceding the

21      filing of the original complaint and the time additional

22      class members opt-in to the collective action.

23      Excluded from the class are those class members

24      whose overtime claims were settled in the March 14, 2011

25      Farmers-Department of Labor Settlement Agreement for

26      Farmers Services and Farmers Insurance Exchange's

27      employees at the Overland Park ServicePoint for the time

28      period between January 1, 2009 to January 1, 2010; the

27

1    Olathe HelpPoint for the time period between January 1,

2    2009 to May 10, 2010; the Austin, Texas ServicePoint for

3    the time period between January 1, 2009 to February 1,

4    2010; the Grand Rapids HelpPoints call center for the

5    time period between January 1, 2009 to May 10,2010, and

6    for the Grand Rapids ServicePoint for the time between

7    January 1, 2009 to February 1, 2010.  Further excluded

8    are those whose employment with the Defendants began

9    after January 1, 2011.

10   (Mot. for Cond'l Cert. at 3.)

11        **1. Standard**

12        The parties first dispute the standard that should apply to

13   certification of a collective action here.  Section 216(b) provides

14   that a collective action may be maintained where the claimants are

15   "similarly situated."  The statute does not define the term

16   "similarly situated," and as far as the Court can tell, both the

17   Supreme Court and the Ninth Circuit have yet to interpret the

18   phrase.  Although courts have taken a few different approaches to

19   certification of a collective action, see generally 7B Charles Alan

20   Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc.

21   § 1807, most courts interpreting § 216(b), including those in the

22   Ninth Circuit and in California, have adopted a two-step approach.

23   See, e.g., Wynn v. Nat'l Broad. Co., Inc., 234 F. Supp. 2d 1067,

24   1082 (C.D. Cal. 2002); Leuthold, 224 F.R.D. at 466-67; see also

25   Newberg on Class Actions § 24:3 (4th ed. 2008) ("Most courts have

26   interpreted § 216(b) as requiring an analysis of whether plaintiffs

27   are 'similarly situated' at two stages in the litigation: when

28

notice to prospective class members is initially sought and then following discovery."); 7B Wright, Miller & Kane § 1087.

At the first stage, the court considers whether to certify a collective action and permit notice to be distributed to putative class members.  See Thiessen v. General Electric Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001).  Courts making a notice-stage determination tend to require "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."  Id. (internal quotation marks omitted).  A plaintiff "need not show that his position is or was identical to the putative class members' positions; a class may be certified under the FLSA if the named plaintiff can show that his position was or is similar to those of the absent members."  Freeman v. Wal-Mart Stores, Inc., 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003). "While the standard for conditional approval at the stage of the litigation is lenient, it does require some evidentiary support. The lack of any evidence of similarity or even other potential class members precludes class certification."  Bishop v. Petro-Chemical Transport, LLC, 582 F. Supp. 2d 1290, 1296 (E.D. Cal. 2008)(emphasis in original); see Bernard v. Household Intern., Inc., 231 F. Supp. 2d 433, 435 (E.D. Va. 2005) ("Mere allegations will not suffice; some factual evidence is necessary."); Freeman, 256 F. Supp. 2d at 945; Grayson v. K Mart Corp., 79 F.3d 1086, 1097 (11th Cir. 1996) (plaintiffs may meet their burden "by making substantial allegations of class-wide [violations], that is, detailed allegations supported by affidavits which successfully engaged defendants' affidavits to the contrary" (internal quotation marks omitted)).  Plaintiffs will be

1  deemed similarly situated "when there is a demonstrated similarity
2  among the individual situations [–] some factual nexus which binds
3  the named plaintiffs and the potential class members together as
4  victims of a particular alleged" policy or practice.  <u>Bonilla v.</u>
5  <u>Las Vegas Cigar Co.</u>, 61 F. Supp. 2d 1129, 1138-39 n.6 (D. Nev.
6  1999) (internal quotation marks omitted).

7      The second stage often occurs at the conclusion of discovery.
8  At that stage, courts use a stricter standard of "similarly
9  situated" by reviewing several factors, including (1) disparate
10 factual and employment settings of the individual plaintiffs; (2)
11 the various defenses available to the defendant which appear to be
12 individual to each plaintiff; and (3) fairness and procedural
13 considerations.  <u>Leuthold</u>, 224 F.R.D. at 467.  Where significant
14 discovery has been completed at the time of class certification,
15 "some courts have skipped the first-step analysis and proceeded
16 directly to the second step."  <u>See</u> <u>Lockhart v. County of Los</u>
17 <u>Angeles</u>, No. CV 07-1680 ABC (PJWx), 2008 WL 2757080 at *4 (C.D.
18 Cal. 2008) (collecting cases); <u>Pfohl v. Farmers Ins. Group</u>, CV 03-
19 3080 DT (Rcx), 2004 WL 554834 at *2-3 (C.D. Cal. 2004).

20      **2.Application**
21      The court has already found that Plaintiffs' state law claims
22 regarding pre-shift work meet the requirements of Rule 23.  As the
23 underlying factual and legal questions are identical with respect
24 to their FLSA claims, the court finds that even under the more
25 stringent second stage standard, Plaintiffs have met their burden
26 with respect to the pre-shift work.  As discussed in the analysis
27 of commonality, there are common questions of fact and law as to
28 Defendants' policy of requiring pre-shift work which extend across

1   the subclasses.  Also as discussed above, Plaintiffs have

2   demonstrated that individualized issues do not predominate, and

3   that Defendants do not have defenses that are individual to each

4   plaintiff.  Finally, the court finds that a collective action is

5   fair and procedurally efficient in this case.  Thus, Plaintiffs

6   have met the requirements for certification of a collective action

7   with respect to the pre-shift work.

8        Also as discussed above, Plaintiffs have not established that

9   there was a "single decision, policy, or plan" regarding off-the

10  clock work except with respect to pre-shift log-in and boot-up

11  procedures.  The collective action, like the Rule 23 action, is

12  conditionally certified only with respect to the pre-shift work.

13                  **3. Statute of Limitations**

14       Although Plaintiffs' claims are suitable for treatment as a

15  collective action, there is a question as to whether the putative

16  class has claims that are not barred by the statute of limitations

17  for FLSA claims.  The statute of limitations under the FLSA is

18  two years after the cause of action accrued, or three years for

19  willful violations.  29 U.S.C. § 255.  In a collective action, the

20  action is considered to have commenced on the date when the

21  complaint was filed for named plaintiffs, or, for those people

22  joining the action, on the date on which the person files written

23  consent with the court.  29 U.S.C. § 256.

24       Here, the original complaint was filed on March 22, 2011.

25  Thus, the statute of limitations for the named plaintiffs extends

26  to March 22, 2008, for willful violations.[3]  As a result, with no

27  ────────────────

28       [3]The court assumes without deciding that Plaintiffs are
                                                    (continued...)

tolling, the statute of limitations for FLSA claims regarding willful violations is three years from the filing of the original complaint (March 22, 2011) for the named plaintiffs, and three years from the opting in of the other plaintiffs. The named Plaintiffs who did not work at one of the facilities covered by the DOL settlement can make claims accrued starting in March 2008 (if the violations were willful) or March 2009 (if they were not willful).

For parties who have yet to opt in, the statute of limitations typically is dated three years prior to the date of opting in. If employees were to opt in on April 1, 2013, they would be eligible only to make claims dating April 1, 2010, or later. In this case, Plaintiffs concede that no potential class members who worked at ServicePoints after February 1, 2010, or at Help Points after May 10, 2010, are likely to have claims, due to the change in timekeeping and payroll policies. (See Plaintiff's Supp. Briefing at 8; Exhs. 1-3, FLSA Narratives.) Without tolling, then, no employees would appear to have live claims.

### a. Equitable Tolling

"Equitable tolling is extended sparingly and only where claimants exercise diligence in preserving their legal rights." Adams v. Inter-Con Sec. Sys., Inc., 242 F.R.D. 530, 542 (N.D. Cal. 2007) (citing Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990)). Equitable tolling is appropriate "where the claimant has actively pursued his judicial remedies by filing a defective

_____

[3](...continued)
alleging willful violations. The statute of limitations for non-willful violations is two years. This determination will be made at the merits phase.

pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Irwin, 498 U.S. at 96. See also Stoll v. Runyon, 165 F.3d 1238, 1242 (9th Cir. 1999)("Equitable tolling applies when the plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant, or when extraordinary circumstances beyond the plaintiff's control made it impossible to file a claim on time.") "[T]he inquiry should focus on fairness to both parties." Adams, 242 F.R.D. at 543.

Here, Plaintiffs argue that the statute of limitations should be tolled for opt-ins to the date of filing of the original Complaint because Defendants "used a motion to dismiss and the discovery process to run out the clock on the putative class members' claims." (Plaintiffs' Supp. Brief. at 2.) They also assert that Defendants withheld the class list and other documents, including documents regarding the DOL investigation and all copies of HR manuals. (Plaintiffs' Reply to Defendants' Supplemental Briefing at 5 n.3, 7.)

There is mixed authority as to when equitable tolling should be used when defendants withhold a class list. District courts may permit discovery of the names and address of potential class members at the conditional certification stage. Hoffman-La Roche Inc., 493 U.S. at 170. Courts appear to agree that disclosure of the class list is not required until an action has been conditionally certified. "Under 29 U.S.C. § 216(b), defendant is only required to provide potential plaintiffs' contact information after conditional certification of the collective class." Adams, 242 F.R.D. at 543 (citing Hoffman-La Roche Inc. v. Sperling, 493

1   U.S. at 170).  However, some courts have found it appropriate to
2   allow pre-certification discovery of the class list to allow
3   putative class members to opt in earlier.  "Encouraging early
4   certification furthers the FLSA's broad remedial goal because the
5   FLSA's limitations period continues to run until the potential
6   class member opts in, giving rise to a need to identify and provide
7   notice to potential class members promptly."  <u>Whitehorn v.</u>
8   <u>Wolfgang's Steakhouse, Inc.</u>, No. 09Civ.1148(LBS), 2010 WL 2362981
9   at *2 (S.D.N.Y. 2010)(internal quotation marks and citations
10  omitted).

11      Other courts have found it appropriate to grant equitable
12  tolling when a class list is not produced upon request.  In such
13  cases, "[a]pplying equitable tolling . . . counters the advantage
14  defendants would otherwise gain by withholding potential
15  plaintiffs' contact information until the last possible moment.
16  Faultless potential plaintiffs should not be deprived of their
17  legal rights on the basis of a defendant's delay, calculated or
18  otherwise."  <u>Adams</u>, 242 F.R.D. at 543.  This court agrees.
19  Although the statute does not require production of the class list
20  prior to conditional certification, without equitable tolling
21  defendants have the incentive to delay proceedings and to run the
22  clock as long as possible.  It is therefore more equitable to toll
23  the statute of limitations to 30 days after the first request for
24  the production of the class list, the time when Plaintiffs could
25  reasonably have expected to receive the list.

26      Here, Plaintiffs claim that "Defendants refused to produce a
27  class list from the outset," referring to the Joint 26f Report,
28  Dkt. No. 48 (Feb. 16, 2012), which said that "Defendants contend

1   that the Court should not authorize discovery of putative class

2   members' names and contact information unless it conditionally

3   certifies a class."  Plaintiffs do not indicate any other attempts

4   to obtain the names of the potential members of the collective

5   class, presumably based on the authority apparently provided to

6   Plaintiffs indicating that a class list would not be provided until

7   a class obtained conditional certification.[4]  (Transcript of

8   hearing on April 1, 2013, 7-8.)

9        Defendants assert that they would be prejudiced by equitable

10  tolling because it would "increase their potential liability beyond

11  what they would normally face under the FLSA."  (Defendants'

12  Supplemental Briefing in Opposition to Plaintiffs' Motions for

13  Certification at 8.)  In the court's view, tolling preserves

14  putative collective action members' rights under the FLSA.  The

15  effect of this is to make Defendants potentially liable for a time

16  period longer than the period if there were no tolling.  However,

17  in the court's view, the result is not an extraordinary expansion

18  of Defendants' liability under the FLSA but instead the restoration

19  of Plaintiffs' ability to recover for alleged violations of the

20  FLSA.

21              **b. DOL Tolling Agreement**

22       Plaintiffs also assert that all putative collective action

23  members should be able to avail themselves of the DOL Tolling

24  Agreement.  Defendants contend that only the DOL may assert the

25  Tolling Agreement.  The court finds that the Agreement may be

26

27  _____

28       [4] Plaintiffs reported that the case Defendants cited was
    <u>Mitchell v. Acosta Sales, LLC</u>, CV 11-1796-GAF (Opx), Aug. 29, 2011.

1  invoked by both the DOL and employees, but only by those employees

2  who worked at facilities investigated by the DOL.

3      The Agreement specifically refers to the ability of the

4  affected employees to file suit. "The Secretary or <u>affected</u>

5  <u>employees</u> may ultimately bring legal proceedings under the Act."

6  (<u>Id.</u> at FIE001163 (emphasis added).)  The Agreement also explicitly

7  states that it may be invoked "in all legal proceedings that may be

8  brought pursuant to Sections 16(b), 16(c), and/or 17 of the Act."

9  (<u>Id.</u> at FIE001164.)  However, there is no evidence that employees

10  at facilities not investigated by the DOL were contemplated as

11  beneficiaries by either party at the time of the agreement.

12  Extending the settlement agreement to employees not contemplated by

13  the parties as beneficiaries of the settlement would render the

14  settlement agreement overly open-ended and vague and would violate

15  principles of contract interpretation.  "To sue as a third-party

16  beneficiary of a contract, the third party must show that the

17  contract reflects the express or implied intention of the parties

18  to the contract to benefit the third party.  The intended

19  beneficiary need not be specifically or individually identified in

20  the contract, but must fall within a class clearly intended by the

21  parties to benefit from the contract." <u>Klamath Water Users</u>

22  <u>Protective Ass'n v. Patterson</u>, 204 F.3d 1206, 1211 (9th Cir. 1999)

23  (citation omitted).  Here, there is no indication in the language

24  of the settlement agreement that it was intended to apply to

25  Farmers facilities other than those named.

26      **C. Conclusion on Conditional Certification**

27      For these reasons, the court finds that the FLSA class is

28  suitable for conditional certification.  The statute of limitations

1   shall be tolled to 30 days after the date when Plaintiffs first

2   requested the class list, which appears to have been when they

3   served their discovery on January 25, 2012.  (Plaintiffs' Reply to

4   Defendants' Supplemental Briefing, 5 n.3, 9.)  The statute of

5   limitations shall start from February 24, 2012.

6   **IV. Conclusion**

7       For the reasons stated above, the court GRANTS certification

8   of the class as here defined:

9       All persons who are, or have been, employed by Farmers

10      Services, LLC., and/or Farmers Insurance Exchange in the

11      State of [state name] as call center employees who

12      performed the job duties of a "Customer Service

13      Representative" or a similar customer-facing job position

14      with the central duty of taking inbound telephone calls

15      from policyholders and agents, during the time period

16      between [start date as determined by state statute of

17      limitations] and [February 1, 2010, at ServicePoint

18      contact centers and May 10, 2010, at HelpPoint contact

19      centers].

20      For the reasons stated above, the court also conditionally

21  certifies for notice purposes the collective action as here

22  defined:

23      All current and former customer facing call center

24      employees of Defendants, Farmers Services L.L.C., Farmers

25      Insurance Exchange, and 21st Century Insurance Company,

26      that held or hold the position of "Customer Service

27      Representative," "Customer Service Associate," "Customer

28      Service Advocate," or similar positions between the

1    relevant statutory period, three years preceding February

2    24, 2012, and the time additional class members opt in to

3    the collective action.

4         Excluded from the class are those class members whose

5    overtime claims were settled in the March 14, 2011 Farmers-

6    Department of Labor Settlement Agreement for Farmers Services

7    and Farmers Insurance Exchange's employees at the Overland

8    Park ServicePoint for the time period between January 1, 2009

9    to January 1, 2010; the Olathe HelpPoint for the time period

10   between January 1, 2009 to May 10, 2010; the Austin, Texas

11   ServicePoint for the time period between January 1, 2009 to

12   February 1, 2010; the Grand Rapids HelpPoints call center for

13   the time period between January 1, 2009 to May 10,2010, and

14   for the Grand Rapids ServicePoint for the time between January

15   1, 2009 to February 1, 2010.  Further excluded are those whose

16   employment with the Defendants began after February 1, 2010,

17   at ServicePoint contact centers and May 10, 2010, at HelpPoint

18   contact centers.

19

20        IT IS SO ORDERED.

21

22   Dated:July 17, 2013

23                                    DEAN D. PREGERSON
                                      United States District Judge

24

25

26

27

28